2003 ND 55

**MaLaura SCHMIDT, Plaintiff
and Appellant,**

v.

**Warren A. SCHMIDT, Defendant
and Appellee.**

No. 20020202.

Supreme Court of North Dakota.

April 15, 2003.

Robert S. Rau, Bosard, McCutcheon & Rau, Ltd., Minot, ND, for plaintiff and appellant.

Chad C. Nodland, Chad C. Nodland, Bismarck, ND, for defendant and appellee.

VANDE WALLE, Chief Justice.

[¶ 1] MaLaura Schmidt ("Lauri") appealed from the judgment entered in her divorce action against Warren A. Schmidt. We conclude the trial court's findings of fact on child custody and visitation are not clearly erroneous, and we affirm.

[¶ 2] The parties married in 1996. The family lived on a farm near Max. Warren farmed throughout the marriage. Lauri worked part-time at a Max bank after the parties married and later worked in a Minot law office. Lauri stayed home for about eight weeks after their son, Trevor, was born in 1998. While the parties were working, Trevor went to a daycare provider near Max, but spent one day a week with Warren's mother.

[¶ 3] Lauri sued for a divorce in August of 2001, and moved out of the marital home in September. At an interim order hearing, Lauri testified she had leased a home at Prairie View Heights 15 miles south of Minot. The trial court issued an interim order providing, in part: (1) the parties had custody of Trevor on alternating weekends; (2) Warren had custody of Trevor during the daytime Monday through Friday, while Lauri had custody of Trevor in the evenings; and (3) "Daycare for Trevor shall remain with his previously established daycare provider unless the parties otherwise jointly agree." The judgment granted the parties a divorce, awarded primary physical custody of Trevor to Warren, provided Lauri with visitation, ordered Lauri to pay child support, awarded Lauri spousal support for 30 months, and divided the parties' marital property and debts.

[¶ 4]   On appeal, Lauri contends the trial court erred in its custody and visitation determinations.   She also requests attorney fees.

## I

[¶ 5]   We exercise a limited review of child custody awards in divorce cases.  *Stoppler v. Stoppler*, 2001 ND 148, ¶ 7, 633 N.W.2d 142.  A custody determination is a finding of fact that will not be set aside on appeal unless it is clearly erroneous.  *Id.* Before we can determine if findings of fact are clearly erroneous, we must understand the basis for the trial court's decision.  *In re Griffey*, 2002 ND 160, ¶ 8, 652 N.W.2d 351.  A trial court's findings of fact are presumptively correct, and we view the evidence in the light most favorable to the findings.  *Stoppler*, at ¶ 7.

[¶ 6]   Under  N.D.C.C.  § 14–09–06.1, the trial court must award the custody of an unmarried minor child "to a person, agency, organization, or institution as will, in the opinion of the judge, promote the best interests and welfare of the child." In making an initial custody determination, a trial court must consider all of the factors specified in N.D.C.C. § 14–09–06.2(1) and base its decision on the best interests and welfare of the child.  *Stoppler*, 2001 ND 148, ¶ 5, 633 N.W.2d 142.  Section 14–09–06.2(1), N.D.C.C., provides, in part:

1.  For the purpose of custody, the best interests and welfare of the child is determined by the court's consideration and evaluation of all factors affecting the best interests and welfare of the child. These factors include all of the following when applicable:

    a.  The love, affection, and other emotional ties existing between the parents and child.

    b.  The capacity and disposition of the parents to give the child love, affection,  and  guidance  and  to continue  the  education  of  the child.

    c.  The disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.

    d.  The length of time the child has lived in a stable satisfactory environment and the desirability of maintaining continuity.

    e.  The permanence, as a family unit, of the existing or proposed custodial home.

    f.  The moral fitness of the parents.

    g.  The mental and physical health of the parents.

    h.  The home, school, and community record of the child.

    i.  The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.

    j.  Evidence of domestic violence . . . .

    k.  The interaction and interrelationship, or the potential for interaction and interrelationship, of the child with any person who resides in, is present, or frequents the household of a parent and who may significantly affect the child's best interests.   The court shall consider that person's history of inflicting, or tendency to inflict, physical harm, bodily injury, assault, or the fear of physical harm, bodily injury, or assault, on other persons.

    l.  The making of false allegations not made in good faith, by one parent against the other, of harm to a

child as defined in section 50–25.1–02.

m. Any other factors considered by the court to be relevant to a particular child custody dispute.

Although a separate finding is not required for each factor under N.D.C.C. § 14–09–06.2(1), the trial court's findings should be stated with sufficient specificity to enable a reviewing court to understand the factual basis for the court's decision. *Griffey*, 2002 ND 160, ¶ 8, 652 N.W.2d 351.

[¶ 7] In considering the factors specified by N.D.C.C. § 14–09–06.2(1), the trial court found one, factor c, slightly favored Lauri; found factors a and e favored Warren; found factor k strongly favored Warren; and found the other factors favored neither party, or were not factors in the court's decision. Because Lauri contends the trial court's custody award is clearly erroneous, we quote the court's findings on the factors favoring Warren at length:

a. *The love, affection and other emotional ties existing between the parents and child.*

Several witnesses testified about the relationship between Trevor and each of his parents. Some of the more convincing testimony came from Agnes Dobowey, a retired elementary teacher, who now operates a day care facility. Ms. Dobowey started taking care of Trevor in 1998 during the month of December and now cares for him an average of four days a week.

Ms. Dobowey testified that Trevor has bonded well with his father—that Trevor warmly receives his father—but that he does not show the same warm reception toward his mother. Ms. Dobowey testified that when Trevor comes back from Warren's weekend visitation, Trevor talks about what he did with his dad, but when Trevor comes back from Lauri's weekend, Trevor never talks about

it. Primarily because of Ms. Dobowey's experience with small children, I find that she likely possesses more insight than some of the other witnesses.

. . . .

In addition to her added training, I find ... Ms. Dobowey to be a more impartial witness than the relatives or close personal friends of either parent. This factor is not about which parent fixes the most meals or washes the most clothes. This factor is about bonding. At this point in his life, there appears to be a greater bonding between Trevor and his father. I find that this factor favors Warren Schmidt.

. . . .

e. *The permanence, as a family unit, of the existing or proposed custodial home.*

Both Warren and Lauri were raised in North Dakota, and both have been gainfully employed in North Dakota for the past several years. The impact of remarriage by either parent would be a matter of speculation. Warren's situation may be more permanent than that of Lauri because of his investment in farming and his strong family ties in North Dakota. I find that this factor favors Warren.

. . . .

k. *The interaction and interrelationship, or the potential for interaction and interrelationship, of the child with any person who reside[s] in, is present or frequents the household of a parent and who may significantly affect the child's best interests. The court shall consider that person's history of inflicting, or tendency to inflict, physical harm, bodily injury, assault, or the fear of physi-*

*cal harm, bodily injury or assault on other persons.*

Marian Schmidt, Warren's mother, says that she sees Warren nearly every day. Warren has taken over operation of the family farm after the fairly recent death of his father. Marian Schmidt says that she takes care of Trevor one day a week and that she also sees Warren's brother and his family every week.

Michelle Schmidt is Warren's sister-in-law. Michelle says that Trevor runs to his Uncle Kendal and refers to him as "Uncle".

Lauri was placed in foster care as a child and does not know her father. Lauri's mother and her spouse live in Vancouver, Washington. Lauri has a half sister in Apple Valley, Minnesota. Lauri also has another half sister but Lauri doesn't know where she lives. Lauri has an aunt and uncle in North Dakota but there does not exist a strong relationship. However, Lauri does have a grandmother who resides in a Garrison nursing home. Neither Warren nor Lauri appear to have "significant others" in their lives at this time.

It is to Lauri's credit that she appears to recognize the importance to Trevor of Warren's extended family by liberally allowing contact. However, I find that this criteria strongly favors Warren.

[¶ 8] The trial court concluded Trevor's interests would be best served by granting Warren custody of Trevor:

Determining a child's best interests involves more than adding up legislatively enacted "best interest factors" although, arguably, the greater numbers of factors seem to favor Warren. Because of Trevor's age, I am convinced that bonding is of particular importance. Although there is obviously love between Trevor and Lauri, I am impressed by the degree of bonding between Tre-

vor, Warren and Warren's extended family. Both Lauri and Warren are good parents. Each has their strengths and weaknesses. However, after considering all of the evidence, I am of a conviction that Trevor's interests would be best served if he were placed in the physical custody of Warren Schmidt.

[¶ 9] Lauri asserts:

In this case, the trial court found that Lauri was the equivalent of the primary caregiver in as much as she "has provided for most of Trevor's physical requirements".... Yet with abundant testimony as to what Lauri provided and did for this preschooler for years and while her husband was a distant and generally an out of the home parent, custody was awarded to the absent parent.

"Both care and support are important functions of any family situation." *Porter v. Porter*, 274 N.W.2d 235, 242 (N.D.1979). Neither a working mother nor a working father is disqualified for custody of a child, "but where each parent works outside of the home and where each has the ability and desire to care for their children, the trial court must necessarily weigh the circumstances on a fine and delicate scale." *Landsberger v. Landsberger*, 364 N.W.2d 918, 920 (N.D.1985). Thus, being a child's primary caretaker does not guarantee a custody award in a divorce action for, while a child's primary caretaker is a factor for the trial court to consider, "the primary caretaker rule has not been given presumptive status in this state." *DesLauriers v. DesLauriers*, 2002 ND 66, ¶ 8, 642 N.W.2d 892.

[¶ 10] Lauri contends a trial court cannot consider a party's extended family as a basis for child custody; custody decisions have nothing to do with a child's bonding with third parties; and the legislative history of factor k shows "the fram-

ers of this provision were concerned, not with extended families and a positive influence they might have, but rather third parties that were negative influences on the children." However, in addition to containing twelve specific factors for a trial court to consider in determining a child's best interests and welfare, N.D.C.C. § 14–09–06.2(1) contains a broad additional provision: "m. Any other factors considered by the court to be relevant to a particular child custody dispute." In our view, that catch-all category, is sufficiently broad to encompass those matters. *See In re Annexation of Part of Unity Pub. Sch. Dist. No. 80*, 540 N.W.2d 393, 397 (N.D.1995) (construing N.D.C.C. § 15–27.2–04(3)(*o*), authorizing consideration of "other relevant factors"); *In re Annexation of Part of Donnybrook Pub. Sch. Dist. No. 24*, 365 N.W.2d 514, 524 (N.D.1985) (construing N.D.C.C. § 15–53.1–06(3)(*o*), authorizing consideration of "other relevant factors").

[¶ 11] Courts may consider a child's interaction and interrelationship with any other person who may significantly affect the child's best interest. 2 Sandra Morgan Little, *Child Custody and Visitation*, § 10.09[1] (2002). While "[m]any aspects of a child's existence necessarily change as the result of the break-up of the nuclear family ... commentators, legislators and the courts have recognized the importance to the child of maintaining stability and continuity to the greatest extent possible." *Id.* at § 10.09[2]. "It is generally thought that the child's best interest is served if his or her accustomed mode of living or home environment is not abruptly changed." *Id.* "[T]he relationship of the child with any person who may significantly affect the child's best interest may be considered by the court. Thus, the interaction and interrelationship of the child with secondary caretakers, stepparents, and other relatives as well as nonrelatives could be involved." *Id.* at § 10.09[4].

[¶ 12] In addition to consideration under factor m, these matters may appropriately be considered under factors d and e. Although not necessarily controlling, a "trial court's concerns about ... allowing the child to attend the same school and live in the same house are all valid considerations under factor d." *Shaw v. Shaw*, 2002 ND 114, ¶ 7, 646 N.W.2d 693. "[F]actor d addresses past stability of environment, including a consideration of place or physical setting" and "the prior family unit and its lifestyle as part of that setting." *Stoppler v. Stoppler*, 2001 ND 148, ¶ 9, 633 N.W.2d 142. However, even a child's preference to remain in its existing physical setting may have to give way to maintain a relationship with one of the child's parents. *Klose v. Klose*, 524 N.W.2d 94, 97 (N.D.1994). "Under factor e, trial courts are to weigh all facts that have a bearing on the permanance of the family unit that will exist in the proposed custodial home of each parent." *Shaw*, at ¶ 9. As Justice Levine noted in her dissenting opinion in *Dinius v. Dinius*, 448 N.W.2d 210, 218 (N.D.1989), in adopting what is now factor e, "the Legislature surely had in mind something more than a physical structure or a geographical location." Factor e deals with future prospects for permanence as a family unit and is focused on the child's prospects for a stable family environment. *Stoppler*, 2001 ND 148, ¶ 9, 633 N.W.2d 142.

[¶ 13] This Court has recognized that "[c]hildren need interaction and interrelationship with their parents, siblings, and other persons who may significantly affect the child's best interests." *Lapp v. Lapp*, 293 N.W.2d 121, 130 (N.D.1980). A child's interaction and interrelationships with relatives and others may assist in determining the desirability of maintaining a stable satisfactory environment to the

extent possible and in assessing a child's prospects for a stable family environment. We conclude a trial court determining the best interest and welfare of a child in making a custody decision may appropriately consider such things as the child's interaction and interrelationships with a party's extended family and other people, such as childcare providers and others who may significantly affect the child's best interests. We conclude the trial court's custody decision is not clearly erroneous.

## II

[¶ 14] Lauri contends the trial court erred in its visitation determination, because she, "as primary caregiver was given minimal visitation time by the trial court," which "resulted in a harm to the minor child." Section 14–05–22(2), N.D.C.C., provides:

> After making an award of custody, the court shall, upon request of the noncustodial parent, grant such rights of visitation as will enable the child and the noncustodial parent to maintain a parent-child relationship that will be beneficial to the child, unless the court finds, after a hearing, that visitation is likely to endanger the child's physical or emotional health.

Visitation is presumed to be in the best interest of a child and is a right of the child. *Berg v. Berg*, 2002 ND 69, ¶ 9, 642 N.W.2d 899. The primary purpose of visitation is to promote the best interests of children. *Id.* A trial court's decision on visitation is a finding of fact that will not be reversed unless it is clearly erroneous. *Id.* at ¶ 4. A finding of fact is clearly erroneous only if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, upon review of the entire evidence, we are left with a definite and firm conviction a mistake has been made. *Id.*

[¶ 15] The judgment contains the following visitation provisions:

> Warren is awarded primary physical custody of Trevor. MaLaura Schmidt (hereinafter "Lauri") shall have visitation the second and fourth weekends of each month beginning 6 p.m. on Friday and lasting until 6 p.m. on Sunday. Lauri shall have one overnight visitation per week between 4 p.m. and 9 a.m. (Some adjustment may be necessary when Trevor becomes of school age).
>
> The parties shall alternate holidays of Thanksgiving, Easter, Fourth of July, Memorial Day, Labor Day, Christmas Eve and Christmas Day. Christmas Eve is defined as beginning at 7 p.m. on December 18th and ending at 7 p.m. on December 24th. Christmas Day is defined as beginning at 7 p.m. on December 24th and ending at 7 p.m. on December 30th. Once Trevor becomes of school age, Christmas vacation shall begin the day following school adjournment and ending the day prior to commencement of school with the vacation split as noted above. Warren shall always have visitation on Father's Day and Lauri shall always have visitation on Mother's Day. It is recommended that Warren and Lauri jointly plan and participate in Trevor's birthdays. In the event that they cannot otherwise agree, the parties shall alternate custody of Trevor on his birthdays. Holidays and other specified special days shall take priority over weekend and summer vacation.
>
> Lauri shall have Trevor for a minimum of 30 days during the summer and shall notify Warren of a reasonable time in advance of the days she selects so as to accommodate vacation plans for both parties.
>
> Each party shall have telephone contact with Trevor whenever he is in the

care of the other parent. Telephone calls shall be at reasonable times and duration.

Thus, Lauri has not been "given minimal visitation time." The trial court afforded Lauri an opportunity to exercise visitation amounting to nearly one-third of the total time available. We conclude the trial court has afforded Lauri visitation that will enable her and Trevor to maintain a parent-child relationship that will be beneficial to Trevor. Although Lauri has asserted the trial court's visitation determination "resulted in a harm to the minor child," she has not made any showing of harm. We conclude the trial court's visitation determination is not clearly erroneous.

### III

[¶ 16] Lauri has "requested that there be an award of attorney fees for trial and appellate proceedings." Section 14–05–23, N.D.C.C., provides, in part: "During any time in which an action for separation or divorce is pending, the court, upon application of a party, may issue an order . . . for the payment of attorney fees."

[¶ 17] In an interim order issued October 3, 2001, the trial court ordered Warren to pay partial attorney fees of $1,000 to Lauri's attorney. In the judgment issued July 3, 2002, the trial court granted Lauri an additional partial attorney fee award of $1,000. Warren has asserted that Lauri's Capital One credit card debt, which the judgment required him to pay, included additional attorney fees.

[¶ 18] "We have concurrent jurisdiction with the trial court to award attorney fees on appeal." *Harger v. Harger*, 2002 ND 76, ¶ 16, 644 N.W.2d 182. The key factors in determining the propriety of an attorney fee award in a divorce action are one party's needs and the other's ability to pay. *Pearson v. Pearson*, 2000 ND 20, ¶ 25, 606 N.W.2d 128. We

ordinarily prefer the trial court to make the initial determination of an attorney fee award on appeal, because it is in a "better position to consider special factors relevant under N.D.C.C. § 14–05–23 relating to the financial status of the parties and the need for and ability to pay attorney's fees." *Myers v. Myers*, 1999 ND 194, ¶ 14, 601 N.W.2d 264. However, from our review of the record and arguments presented in this case, we conclude Lauri has not shown a need for an additional attorney fee award, and we deny the request.

### IV

[¶ 19] Warren moved for an order striking a copy of an Internet article Lauri included in an addendum to her appellate brief, but which was not in the trial court record on appeal, and, as a sanction, an award of "attorney fees and costs of at least $253.00 for having to bring this motion to strike the items for the record on appeal." In response, Lauri asserted "[o]ne of the issues raised was the safety of the farm setting for the child in question," and the challenged article, which dealt with the drowning risk pools pose for children, "was *other source material* clearly within the framework of Rule 28(f), NDRAP."

[¶ 20] In seeking custody, Lauri attempted to show that Warren's farm was a dangerous place for Trevor. Lauri testified: "There is a lot of water surrounding the farm that isn't very far away if he would wander off that's a concern." Warren testified "that body of water" was there "[m]ost of the time" when he was "growing up" and "I keep it in mind when I know [Trevor] is outside." The trial court addressed Lauri's argument the farm was too dangerous to award custody of Trevor to Warren in its analysis of factor d, which "addresses past stability of environment, including a consideration of

place or physical setting," *Stoppler,* 2001 ND 148, ¶ 9, 633 N.W.2d 142:

> d. *The length of time the child has lived in a stable satisfactory environment and the desirability of maintaining continuity.*

Lauri contends that a farm can be a dangerous place to raise a young child. Trevor has spent his young life on the Schmidt family farm. It would appear that the experience has served him well. It is reasonable to conclude that children raised on a farm have many advantages. Ease of transportation increasingly provides opportunities to farm children previously available only by children in more populated communities, i.e. cultural events, educational opportunities and sports. Lauri expressed concern about the safety issues of raising a child on a farm. More than a few North Dakota residents have been raised on a farm without measurable negative results. Safety should always be a matter of concern whether on farms or in a large metropolitan area. This factor does not significantly favor either parent over the other.

As the trial court observed in *Stoppler:*

> Prior to the parties' separation, the farm was a good, stable and satisfactory environment in which to raise a child. Just because one of the parties has chosen to leave the farm does not suddenly turn the farm into an unsatisfactory and dangerous place in which to raise a child.

*Stoppler,* 2001 ND 148, ¶ 8, 633 N.W.2d 142.

[¶ 21] When Lauri filed her appellate brief, Rule 28(f), N.D.R.App.P., provided: "If determination of the issues presented requires the study of statutes, rules, regulations, other sources, or relevant parts thereof, they must be reproduced in the brief or in an addendum thereto, or they may be supplied to the court in pamphlet form." [1]

[¶ 22] A party may include in a brief materials not in the record if they "are judicially cognizable apart from the record as authorities marshaled in support of a legal argument." *Military Toxics Project v. E.P.A.,* 146 F.3d 948, 954 (D.C.Cir.1998). In *PSC v. Central States Grain, Inc.,* 371 N.W.2d 767, 781 (N.D. 1985), this Court said it "will not take cognizance of evidence by affidavit presented for the first time after the appeal is perfected," and did not consider a non-record affidavit presented in an addendum to an appellate brief. *See also Hicks v. Mickelson,* 835 F.2d 721, 724 (8th Cir. 1987), where the appellate court refused to consider non-record materials, stating: "As then Judge Blackmun succinctly stated, ... '[t]he appeal is to be determined upon the record below.' *Stearns v. Hertz Corp.,* 326 F.2d 405, 408 (8th Cir.), *cert. denied,* 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964)." We have said "[i]nappropriate attempts to supplement the evidentiary record at the appellate level cannot be condoned." *VanDyke v. Van-Dyke,* 538 N.W.2d 197, 203 (N.D.1995) (dealing with allegations not supported by the record and failing to conform with N.D.R.App.P. 28(a)(4), (5)). In *Bublitz v. Tsang,* 2000 ND 100, ¶ 4, 617 N.W.2d 131, we awarded double costs on appeal to one party because the other included in his brief materials that were not part of the district court's record.

[¶ 23] Lauri's attorney said at oral argument that the purpose of the article presented in the addendum was to show

---

1. This is now addressed in N.D.R.App.P. 28(g), which provides: "If the court's determination of the issues presented requires the study of statutes, rules, regulations, etc., the relevant parts must be set out in the brief or in an addendum at the end of the brief."

that ponds are dangerous. The challenged article is evidentiary material calculated to establish that water on Warren's farm posed a danger to Trevor. The challenged material is not a judicially cognizable authority marshaled in support of a legal argument. Rule 28(f), N.D.R.App.P., was not designed to be a license to introduce additional evidence on appeal which was not contained in the record. We grant Warren's motion to strike the article from Lauri's addendum and we award Warren double costs as a sanction under N.D.R.App.P. 13 for Lauri's inclusion of material not in the record and not authorized by N.D.R.App.P. 28(f).

[¶ 24]   Affirmed.

[¶ 25] DALE V. SANDSTROM, WILLIAM A. NEUMANN, and CAROL RONNING KAPSNER, JJ., concur.

MARING, Justice, concurring in the result.

[¶ 26]   I concur in the result only. I continue to be of the opinion that when applying factor (d), a trial court must examine not only past stability of environment, including a consideration of place or physical setting, but a consideration of the prior family unit and its lifestyle as part of that setting. *See Stoppler v. Stoppler*, 2001 ND 148, ¶¶ 26–31, 633 N.W.2d 142 (Maring, J., concurring in part and dissenting in part). This includes consideration of the continuity of the relationship with the parent who had cared for the children on a daily basis. *Id.* at ¶ 28.

[¶ 27]   I also continue to be of the opinion that factor (e) "deals with future prospects for permanence as a family unit." *Id.* at ¶ 9. As we stated in *Stoppler*, "the trial court must weigh all the facts bearing on which parent can best provide their child 'the benefits of a custodial home that is marked by permanence, as a family unit.'" *Id.* (citation omitted). In *Stop-*

*pler*, we voiced our concern when the trial court in applying factor (e) spoke to place and the continuity of physical environment rather than the nature of the family unit of the proposed custodial home and the likely relative permanence of the family unit. *Id.* at ¶ 11. I continue to be troubled by the emphasis on the continuity of the child's physical setting over the importance of the continuity of the parent-child relationship in both factors (d) and (e). I am concerned we still have vestiges of the philosophy that the parent who receives the home where the children have grown up will get custody of the children.

[¶ 28]   Despite the fact that I believe the trial court erred on its application of factor (e), I cannot say its ultimate decision based on all the facts of this case was clearly erroneous.

[¶ 29]   I, therefore, concur in the result.

[¶ 30]   MARY MUEHLEN MARING, J.